UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD-ALLAN SCIENTIFIC LLC,

   Plaintiff,          CASE NO.

v.                 HON.

ANGLIA HANDLEY,

   Defendant.

---

JACKSON LEWIS P.C.
Katherine Van Dyke (P62806)
Linda L. Ryan (P67686)
2000 Town Center, Suite 1650
Southfield, MI  48075
(248) 936-1900
Katherine.vandyke@jacksonlewis.com
linda.ryan@jacksonlewis.com
Attorneys for Defendant

---

# COMPLAINT

For its Complaint against Defendant Anglia Handley, Plaintiff RICHARD-ALLAN SCIENTIFIC LLC (d/b/a Epredia Group Company and formerly a part of Thermo Fisher Scientific Inc.) states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Richard-Allan Scientific, LLC ("RAS") is a limited liability company organized under the laws of the State of Delaware. RAS maintains a principal place of business in Kalamazoo, Michigan.

2. Defendant Anglia Handley is an individual over the age of eighteen who is a resident of the Parish of St. Tammany, State of Louisiana. Hadley is an employee of RAS.

3. In Handley's role with RAS, she was required to, and did, frequently travel to Kalamazoo, Michigan to train RAS's sales team, attend meetings, and oversee the virtual training. She also would accompany sales team members on sales calls in Michigan.

4. The amount in controversy exceeds $75,000.

5. Pursuant to 28 U.S.C. 1332, this Court has diversity jurisdiction over RAS's claims.

6. Venue is appropriate in this judicial district in accordance with 28 U.S.C. §1391(b) as the events complained of occurred or will occur with respect to RAS's business operations conducted in this district.

## GENERAL ALLEGATIONS

7. Handley was hired by ThermoFisher Scientific ("ThermoFisher") in 2003 as an Account Manager/Sales Trainer.

8. On June 10, 2005, Handley was offered the position of Territory Account Manager for ThermoFisher, working in the Richard-Allan Scientific division of ThermoFisher.

9. On June 17, 2005, Handley accepted that offer. (Ex. 1, Formal Acceptance of Employment.)

10. On June 22, 2005, Handley signed an Employee Invention, Confidential Information, Non-Compete and Secrecy Agreement. Pursuant to the Agreement, Handley acknowledged that she would "not disclose or use at any time, except as my duties for the Company require, either during or subsequent to my employment at the Company, any information which was previously received or is hereafter received by me during the period of my employment with the Company." (Ex. 2, 2005 Agreement.)

11. Paragraph 6 of the Agreement prohibits Handley from engaging in "any activity or employment in the faithful performance of which it could be reasonably anticipated that [she]

would use or disclose, or be expected to use or disclose [RAS's] Proprietary and Confidential Information" for a period of twelve months after her employment ends. (Ex. 2, 2005 Agreement ¶ 6.)

12. In February 2007, RAS restructured and formed the Anatomical Pathology Group. Handley served as the Territory Account Manager. (Ex. 3, 2007 Offer.)

13. On February 19, 2010, Handley was promoted to the position of Senior Territory Manager within the Anatomical Pathology Division of ThermoFisher. That offer was contingent upon her agreement to sign a Non-Compete/Confidentiality Agreement. (Ex. 4, 2010 Offer.)

14. On February 17, 2010, Handley executed the Non-Compete Agreement (Ex. 5, 2010 Non-Compete Agreement), which provides:

> Section 1. Employee recognizes and acknowledges that it is essential for the proper protection of the Employer's legitimate business interests that Employee be restrained for a reasonable period following the termination of Employee's employment with the Employer, either voluntarily or involuntarily, from competing with Employer as set forth below.
>
> Employee acknowledges and agrees that during the term of Employee's employment with Employer, and for a period of twelve (12) months thereafter, Employee will not, directly or indirectly, engage, participate or invest in or be employed by any APD Business within the Restricted Area, as defined below, which: (i) develops or manufactures products which are competitive with or similar to products developed or manufactured by Employer's APD Business; (ii) distributes, markets or otherwise sells, either through a direct sales force or through the use of the Internet, products manufactured by others which are competitive with or similar to products distributed, marketed or sold by Employer's APD Business; or (iii) provide services, including the use of the Internet to sell, market or distribute products, which are competitive with or similar to services provided by Employer's APD Business, including, in each case, any products or services Employer has under development or which are the subject of active planning at any time during the term of Employee's employment. The foregoing restrictions shall apply regardless of the capacity in which Employee engages, participates or invests in or is employed by a given business, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise.
>
> "Restricted Area" shall mean each state and territory of the United States of America and each country of the world outside of the United States of America in which Employer's APD Business had developed, marketed, sold

and/or distributed its APD products and/or services within the last two (2) years of Employee's employment.

Section 2. During the term of Employee's employment with Employer and for a period of twelve (12) months after termination of the Employee's employment with the Employer for any reason, Employee will not: (i) employ, hire, solicit, induce or identify for employment or attempt to employ, hire, solicit, induce or identify for employment, directly or indirectly, any employee(s) of the APD Business to leave his or her employment and became an employee, consultant or representative of any other entity including, but not limited to, Employee's new employer, if any; and/or (ii) solicit, aid in or encourage the solicitation of, contract with, aid in or encourage the contracting with, service, or contact any person or entity which is or was, within the two (2) years prior to Employee's termination of employment with Employer, a customer or client of Employer's APD Business, for purposes of marketing, offering or selling a product or service competitive with Employer's APD Business.

Section 3. For the period of twelve (12) months immediately following the end of Employee's employment by Employer, Employee will inform each new employer, prior to accepting employment, of the existence of this Agreement and provide that employer with a copy of this Agreement.

Section 4. Employee understands and agrees that the provisions of this section shall not prevent Employee from acquiring or holding publicly traded stock or other publicly traded securities of a business, so long as Employee's ownership does not exceed 1% percent of the outstanding securities of such company of the same class as those held by Employee or from engaging in any activity or having an ownership interest in any business that is reviewed by the Board of Directors of Employer.

Section 5. Employee acknowledges that the time, geographic and scope of activity limitations set forth herein are reasonable and necessary to protect the Employer's legitimate business interests. However, if in any judicial proceeding a court refuses to enforce this Agreement, whether because the time limitation is too long or because the restrictions contained herein are more extensive (whether as to geographic area, scope of activity or otherwise) than is necessary to protect the legitimate business interests of Employer, it is expressly understood and agreed between the parties hereto that this Agreement is deemed modified to the extent necessary to permit this Agreement to be enforced in any such proceedings.

Section 6. Employee further acknowledges and agrees that it would be difficult to measure any damages caused to Employer which might result from any breach by Employee of any of the promises set forth in this Agreement, and that, in any event, money damages would be an inadequate remedy for any such breach. Accordingly, Employee acknowledges and agrees that if he or she breaches or threatens to breach, any portion of this Agreement, Employer shall be entitled, in addition to all other remedies that it may have: (i) to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to

> Employer; and (ii) to be relieved of any obligation to provide any further payment or benefits to Employee or Employee's dependents.
>
> <u>Section 7.</u> Employee acknowledges and agrees that should it become necessary for Employer to file suit to enforce the covenants contained herein, and any court of competent jurisdiction awards the Employer any damages and/or an injunction due to the acts of Employee, then the Employer shall be entitled to recover its reasonable costs incurred in conducting the suit including, but not limited, reasonable attorneys' fees and expenses.

15. On September 12, 2011, Handley was offered and accepted the position of Instrument Systems Specialist within the Healthcare Market Division, Customer Channels Group of ThermoFisher. (Ex. 6, 2011 Offer.)

16. The offer was contingent upon the execution of an agreement titled "Agreement Relating to Intellectual Property, Confidential Information, Conflicts of Interest, Competitive Activities and Release" ("IP Agreement"), which Handley executed on September 12, 2011. (Ex. 7, 2011 NDA.)

17. Per the terms of the IP Agreement, Handley acknowledged that her position required ThermoFisher to make substantial investments in her professional development, training, and opportunities. (Ex. 7, 2011 IP Agreement ¶1(i)-(iii).)

18. Per Section D of the IP Agreement entitled "Obligations of Employee During and After Employment," Handley also agreed as follows:

> 5. <u>Nondisclosure of Proprietary and Confidential Information</u>. I acknowledge and agree that my employment creates a relationship of confidence and trust between myself and Employer with respect to: (i) all Proprietary and Confidential Information; and (ii) the Proprietary and Confidential Information of others with which Employer has a business relationship. The information referred to in clauses (i) and (ii) of the preceding sentence is referred to in this Agreement, collectively, as "Proprietary and Confidential Information."
>
> I further acknowledge and agree that during the course of my employment with Employer, l will continually be provided with and will have access to Proprietary and Confidential Information and that the unauthorized use or

disclosure of any such Proprietary and Confidential Information at any time would constitute unfair competition with Employer.

At all times, both during my employment with Employer and after the termination or expiration of my employment whether voluntarily or involuntarily, I acknowledge and agree to keep in confidence and trust all such Proprietary and Confidential Information, and agree not to use or disclose any such Proprietary and Confidential Information without the written consent of Employer, except as may be necessary in the ordinary course of performing my duties to Employer.

6. <u>Inevitable Disclosure</u>.  I acknowledge and agree not to engage, without the prior written consent of Employer, either during the period of my employment by Employer or for a period of twelve (12) months after that employment, in any activity or employment in the faithful performance of which it could be reasonably anticipated that I would use or disclose, or be expected or required to use or disclose, Employer's Proprietary and Confidential Information.

I further acknowledge and agree that in light of my position with Employer and my access to Employer's Proprietary and Confidential Information, it can be presumed that I will inevitably disclose such Proprietary and Confidential Information if I subsequently obtain similar or comparable employment with one of Employer's competitors.

The restrictions set forth in this section will not apply to information which is generally known to the public or in the trade, unless such knowledge results from an unauthorized disclosure by me, but this exception will not affect the application of any other provisions of this Agreement to such information in accordance with the terms of such provision.

* * *

11. <u>Employee's Agreement not to Compete with Employer.</u> I acknowledge and agree that during the term of my employment with Employer, and for a period of twelve (12) months thereafter, I will not directly or indirectly, as an employee, consultant, agent, officer, director or stockholder, partner or joint venture of any firm, corporation, partnership, or association which competes with Employer, solicit the business of any customer, supplier and/or vendor of Employer for whom I had sales, sales management, customer service, customer service management, business systems consulting, product sourcing and/or product management responsibility during my last two (2) years of employment with Employer.

12. <u>Non-Solicitation Agreement.</u>  During the term of Employee's employment with Employer and for a period of twelve (12) months after

termination of the Employee's employment with the Employer for any reason, Employee will not employ, hire, solicit, induce or identify for employment or attempt to employ, hire, solicit, induce or identify for employment, directly or indirectly, any employee(s) of the Employer to leave his or her employment and became an employee, consultant or representative of any other entity, including but not limited to Employee's new employer, if any.

\* \* \*

16. <u>Reasonableness of Restrictions.</u> Employee acknowledges that he or she will participate in matters involving Employer's long-term technical and marketing plans and that Employee's knowledge will continue to retain value throughout the duration of this Agreement. Thus, despite the rapid pace of technological change and the dynamic nature of the Internet services industry, the duration of this covenant relating to competitive activities is necessary in order to protect Employer's Proprietary and Confidential Information.

Employee further acknowledges that the transactions conducted in the Internet services industry are not limited by traditional state or geographic boundaries. Furthermore, Employee acknowledges that Employer has extensive contacts with customers across the nation and around the world. The geographic scope of this covenant relating to competitive activities is, thus, necessary due to the fact that Employer's sales territory and business activities are not limited by these physical or potential boundaries.

I understand and agree that the restrictions set forth in paragraphs 5, 6, 7, 9, 10, 12, 13 and 14 of Section D of this Agreement are intended to protect Employer's legitimate business interests and its Proprietary and Confidential Information and established customer relationships and good will. I further acknowledge that the time, geographic and scope of activity limitations set forth herein are reasonable and necessary to protect the Employer's legitimate business interests. However, if in any judicial proceeding a court shall refuse to enforce this Agreement, whether because the time limitation is too long or because the restrictions contained herein are more extensive (whether as to geographic area, scope of activity or otherwise) than is necessary to protect the legitimate business interests of Employer, it is expressly understood and agreed between the parties hereto that this Agreement is deemed modified to the extent necessary to permit this Agreement to be enforced in any such proceedings.

Employee acknowledges that compliance with paragraphs 5, 6, 7, 9, 10, 12 and 13 of Section D of this Agreement is necessary to protect the goodwill and other legitimate business interests of the Employer and that a breach of this provision will give rise to irreparable and continuing injury to the

> Employer which is not adequately compensable in monetary damages or at law. Accordingly, Employee agrees that Employer, its successors and assigns, may obtain injunctive relief against the breach or threatened breach of this provision, in addition to any other legal or equitable remedies which may be available to it under this Agreement.
>
> Employee further acknowledges that in the event of his or her termination, or expiration of his or her employment with the Employer, Employee's knowledge, experience and capabilities are such that Employee can obtain employment in business activities which are of a different and non-competing nature than those performed in the course of employment with the Employer; and that the enforcement of a remedy hereunder by way of injunction will not prevent Employee from earning a reasonable livelihood.
>
> 17. <u>Remedies</u>. Employee acknowledges and agrees that if he or she violates and/or breaches this Agreement in any manner, the Employer shall be entitled to an accounting and repayment of all lost profits, compensation, commissions, remuneration or benefits that Employee directly or indirectly has realized or may realize as a result of any such violation or breach. Employer shall also be entitled to recover for all lost sales, profits, commissions, good will and customers caused by Employee's improper acts, in addition to and not in limitation of any injunctive relief or other rights or remedies that Employer is or may be entitled to at law or in equity or under this Agreement.
>
> Employee further acknowledges and agrees that it would be difficult to measure any damages caused to Employer which might result from any breach by Employee of any of the promises set forth in this Agreement, and that, in any event, money damages would be an inadequate remedy for any such breach, Accordingly, Employee acknowledges and agrees that if he or she breaches or threatens to breach, any portion of this Agreement, Employer shall be entitled, in addition to all other remedies that it may have; (i) to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to Employer; and (ii) to be relieved of any obligation to provide any further payment or benefits to Employee or Employee's dependents.

(Ex. 7, IP Agreement, Sec. D.)

19. As an Instrument Systems Specialist within the Healthcare Market Division, Handley was and is a well-compensated, high-level marketing employee, whose duties included: the development and use of highly sensitive and confidential sales, operational, and marketing information and strategies for key customers and prospects; ascertaining the needs of potential

customers and prospects; developing product sales materials in order to successfully compete for the continued business of existing customers and of future business prospects (including secret new products); and developing pricing and marketing strategies. Handley was one of the most knowledgeable persons within RAS as to these topics for particular customers or particular targeted prospects.

20. In 2016, ThermoFisher sold its Anatomical Pathology Division to PHC Holdings, LLC ("PHC").

21. PHC subsequently established Richard-Allan Scientific, LLC d/b/a Epredia as a separate legal entity, which included the Anatomical Pathology Division in which Handley worked.

22. Handley became the Manager of Commercial Excellence-Global Training Lead, working for RAS d/b/a Epredia.

23. In her new role, Handley's duties expanded to include training of the sales teams throughout the division. She was responsible for managing the inside sales team located in in the Kalamazoo production facility and training the sales team on new products.

24. Handley's duties also included developing quotes for significant customers of RAS, working with the distributors, and importantly, being intimately involved in the analysis of the strengths and weaknesses of instruments and status of production operations. She was included in confidential meetings, which provided her with vast institutional knowledge of RAS's operations.

25. In addition, Handley was responsible for traveling with salespeople in the field. She was, therefore, frequently in Kalamazoo and travelled with salespeople to ensure they were properly explaining the company's products and services to customers and potential customers.

26. Handley also managed RAS's "Live Lab," a virtual meeting platform that provided

customers and prospects with the opportunity to meet virtually for product demonstrations and trainings.

27. By virtue of her position with RAS, which includes sales, marketing, and related business-development duties, Handley is aware of significant confidential information and trade secrets relating to RAS's business. Much of that information is of current, heightened value, especially knowledge concerning product lines in development for identified potential prospects.

28. For example, Handley has knowledge of actual and potential customer strategies, has developed relationships with distributors and customers, knows non-public customer preferences, knows the strengths and weaknesses of products, has developed and knows marketing strategies and objectives, and has knowledge research and development projects. She is highly familiar with RAS's best business practices. All such information is "Confidential Information" as defined by Handley's agreements.

29. On January 31, 2022, Handley submitted a letter of resignation providing that her final day of work for RAS would be on February 14, 2022. (Ex. 8, Letter of Resignation.)

30. Handley also sent RAS what purports to be a draft declaratory action in Louisiana seeking to invalidate her lawful agreements.

31. Upon information and belief, Handley plans to work for a competitor of RAS, yet she has not disclosed which one.

32. Based on these actions, RAS has substantial reason to believe that Handley intends to breach her enforceable and lawful agreements.

33. Unless restrained and enjoined from beginning employment with a direct competitor of RAS, it is inevitable that Handley will use or disclose RAS's Confidential Information.

## COUNT I:
## ANTICIPATORY BREACH OF RESTRICTIVE COVENANTS

34. RAS repeats and incorporates all the previous allegations in its Complaint.

35. The Agreements are valid, enforceable contracts between Handley and RAS.

36. Handley has announced her intention to breach the Agreements through her resignation and delivery of the purported draft declaratory action seeking to invalidate her Agreements.

37. Upon information and belief, Handley has accepted a position with a competitor.

38. She will use her intimate knowledge of RAS's Confidential Information for the benefit RAS's competitor, providing that competitor with an unfair market advantage.

39. By going to a direct competitor, Handley will necessarily and inevitably reveal RAS's Confidential Information in her employment.

40. Her anticipated violation of the Agreements, including her most recent IP Agreement, will cause irreparable damage to RAS's customer goodwill, competitive edge, and confidential and trade secret information.

## COUNT II:
## DECLARATORY RELIEF

41. RAS repeats and incorporates all the previous allegations in its Complaint.

42. An actual controversy exists pursuant to 28 U.S.C. § 2201.

43. Handley seeks to declare her lawful Agreements void in order to compete with RAS.

44. RAS seeks a ruling from this Court that her Agreements are enforceable.

45. If Hadley works for a competitor, she will inevitably use her extensive knowledge of RAS's confidential information to unfairly compete with RAS in violation of her Agreements.

46. Her anticipated violation of the Agreements, including her most recent IP Agreement, will cause irreparable damage to RAS's customer goodwill, competitive edge, and confidential and trade secret information.

## REQUEST FOR RELIEF

WHEREFORE, RAS respectfully requests that this Court:

A. Issue an order declaring these Agreements to be valid and enforceable;

B. Issue temporary, preliminary, and permanent injunctive relief enforcing her Agreements, prohibiting Handley from violating these Agreements (including, but not limited to, accepting or continuing employment with a competitor); and precluding Handley from any misuse of or disclosure of RAS's protectable Confidential Information; and

C. Award RAS its reasonable attorneys' fees and costs; and

D. Issue such other and further relief as the Court may deem just or equitable.

Respectfully submitted,
JACKSON LEWIS P.C.

/s/ Linda L. Ryan
Linda L. Ryan (P67686)
Attorneys for Defendant
2000 Town Center, Suite 1650
Southfield, MI  48075
(248) 936-1900
linda.ryan@jacksonlewis.com

Dated:  February 4, 2022

## **CERTIFICATE OF SERVICE**

      On this day February 4, 2022, the undersigned did cause to be filed the foregoing document with the Court using the CM/ECF system, which will send notice of its filing to all counsel of record.

                                        */s/ Linda L. Ryan*
                                      Linda L. Ryan (P67686)